## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                    )
**PETER HAUGE,**                    )
                                    )          **CIVIL ACTION**
                    **Plaintiff,**  )          **NO.  4:19-40032-TSH**
                                    )
            **v.**                  )
                                    )
**AMERIHOME MORTGAGE COMPANY,**     )
**LLC,**                            )
                                    )
                    **Defendant.**  )
_____ )


## ORDER AND MEMORANDUM ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Docket No. 102)

### September 30, 2021

**HILLMAN, D.J.**

Plaintiff Peter Hauge commenced this action against, *inter alia*, defendant AmeriHome Mortgage Company, LLC under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681s-2(b), alleging that that the defendant failed to reasonably investigate disputed information that the defendant furnished to reporting agencies.  The defendant moves for summary judgment.  (Docket No. 102).  For the following reasons, the Court ***denies*** the motion.

### Background

The following facts are undisputed unless otherwise noted.  In July 2017, the plaintiff purchased property in Charlton, Massachusetts.  (Docket No. 110 at ¶ 1).  The plaintiff had a mortgage on the property, which, as of September 1, 2017, was serviced by the defendant.  (*Id.* at ¶ 2).  A company called Cenlar sub-serviced the loan on the defendant's behalf.  (*Id.* at ¶ 3).  The plaintiff made loan payments online.  (*Id.* at ¶ 5).  When the plaintiff set up the electronic payments

through his bank, he entered information including the defendant's name and address, and what he thought was the correct account number for his loan. (*Id.* at ¶ 7). The account number the plaintiff entered, however, was missing a digit. (*Id.* at ¶ 9).[1]

The plaintiff timely made payments in September, October, and November. (Docket No. 122 at ¶ 53-55). A third-party processing company called Check Free processed the payments for the plaintiff's bank. (Docket No. 110 at ¶ 11). Even though the plaintiff had entered the wrong account number, the defendant accepted the payments. (Docket No. 111-2 at 22-23). In addition to the account number, the payment information sent by Check Free to the defendant included the plaintiff's name and payment amount. (Docket No. 122 at ¶ 61).

On December 5, 2017,[2] the plaintiff initiated his mortgage payment for December in the same way he had the prior three months. (Docket No. 110 at ¶ 10). The defendant received the payment on December 7, 2017. (*Id.*). This time, however, the defendant returned the payment to Check Free, apparently because the payment information contained the wrong account number. (Docket Nos. 110 at ¶ 12; 104-3 at 7; 104-5 at 7). On December 18, 2017, the defendant sent a notice of delinquency to the plaintiff advising him that his December balance remained unpaid. (Docket No. 122 at ¶ 76). On December 29, 2017, the plaintiff called the defendant to find out why his December payment had not been applied to his account; the defendant's call notes state that the plaintiff was advised that the payment had not been received. (*Id.* at ¶ 78). Also on December 29, 2017, the plaintiff's account number was corrected in Check Free's system. (Docket No. 111-2 at 53-54).

---

[1] The plaintiff's account number had ten digits. The plaintiff instead entered only nine of the digits, missing a "1" in between two of the middle digits. (Docket No. 110 at ¶ 9).

[2] The plaintiff's loan payments to the defendant were considered timely by the defendant if they were made by the 15th of each month. (Docket No. 122 at ¶ 52).

The plaintiff made his January mortgage payment on January 5, 2018. (Docket No. 110 at ¶ 14). Check Free returned the December payment to the plaintiff on January 8, 2018. (*Id.* at ¶ 13). Although the plaintiff's account number had been updated in the Check Free system, the January payment sent to the defendant still included the incorrect account number. (Docket No. 106 at 21). As such, the defendant again returned the payment to Check Free. (Docket No. 110 at ¶ 16).

On January 11, 2018, the plaintiff facilitated a three-way call between his bank and the defendant to determine why the payments were not being applied to the plaintiff's mortgage account. (Docket No. 122 at ¶ 80). The defendant's call notes state that the plaintiff was advised that the defendant needed proof of payment to research missing payments. (*Id.* at ¶ 81). The plaintiff called the defendant again on January 20, 2018 and February 1, 2018. (*Id.* at ¶ 83-85). After the latter call, the plaintiff faxed his bank payment records to the customer service supervisor with whom he spoke. (*Id.* at ¶ 88).

On February 8, 2018, the plaintiff's January mortgage payment was returned to him by Check Free. (Docket No. 110 at ¶ 16). The plaintiff called the defendant again on February 9, 2018; he also again sent his bank statements to the defendant. (Docket No. 122 at ¶ 92-93). On another call a few days later, the defendant's call notes state that the plaintiff was informed that his bank payment records were insufficient, and that additional information was needed, such as a bank "transmittal form." (Docket No. 111-5 at 51-52). The plaintiff disputes this; he testified that no one asked him for additional documents. (Docket Nos. 111-7 at 155; 126 at 8).

The plaintiff called the defendant again at the end of February and several more times in March. (Docket No. 122 at ¶ 95, 98, 99). On a call on March 22, 2018, one of the defendant's

customer service representatives advised the plaintiff that he should be receiving a letter confirming that he was never delinquent on the account. (*Id.* at ¶ 102).

On April 4, 2018, the plaintiff submitted a credit dispute to three credit reporting agencies ("CRAs") stating that the payment history on his account with the defendant was incorrect because he had never been late. (*Id.* at ¶ 111). Within a week, the CRAs generated Automated Consumer Dispute Verification ("ACDV") forms and sent them, along with a copy of the plaintiff's letter, to the defendant. (Docket Nos. 110 at ¶ 18-20; 122 at ¶ 113). Comments on two of the forms described the plaintiff's dispute as contesting the account status, payment rating, and account history. (Docket Nos. 110 at ¶ 21; 111-8). Comments on the third form stated, "Claims inaccurate information. Did not provide specific dispute. Provide complete ID and verify account information." (Docket No. 111-9).

Cenlar, the company that sub-serviced the plaintiff's loan on behalf of the defendant, timely responded to the CRAs by stating that the information that the plaintiff disputed was accurate, and that the plaintiff's December 2017 and January 2018 payments were late. (Docket No. 110 at ¶ 3, 19-22). The plaintiff submitted similar written disputes to the CRAs on June 29, 2018 and August 27, 2018. Each time, the CRAs generated ACDV forms and sent them to the defendant with similar messages as before. (Docket Nos. 110 at ¶ 23-31; 111-10). Cenlar continued to report that the plaintiff's December 2017 and January 2018 mortgage payments were late. (Docket No. 110 at ¶ 27, 32).

Cenlar's credit reporting analysts investigated the plaintiff's disputes. (*Id.* at ¶ 33). With each ACDV received from a CRA, Cenlar opened a research process whereby an analyst reviewed the service notes of the plaintiff's account, which included the call notes entered by the defendant's

customer service representative and the bank statements faxed by the plaintiff, and verified the plaintiff's loan transaction and mortgage payment history.  (Docket Nos. 110 at ¶ 34; 122 at ¶ 117).

The plaintiff alleges that because of the defendant's credit reporting, he was denied a home equity credit line from two different lenders.  (Docket No. 110 at ¶ 37-39).  Although the plaintiff spoke with mortgage lenders at two companies, he did not formally apply for loans at either.  (Docket No. 111-7 at 132, 148).  Without a loan, the plaintiff did not have money to renovate the house on his property in Charlton that he had purchased in 2017.  (Docket No. 122 at ¶ 128).  When the plaintiff purchased the property, the house did not have proper septic or heating systems.  (Docket No. 111-7 at 123-125).  The plaintiff testified that he therefore used money from credit cards and his 401(k) to fund the renovations.  (*Id.* at 112, 126, 138).  While there is no documentation in the summary judgment record regarding the plaintiff's alleged 401(k) withdrawal, there is documentation regarding several thousand dollars' worth of credit card purchases at home improvement stores.  (Docket No. 126-2).  During the six months it took to renovate the house, which the plaintiff posits was longer than it would have been had he been able to secure a favorable loan, the plaintiff and his wife paid thousands of dollars in rent to live in the plaintiff's son's basement.  (Docket Nos. 111-7 at 136; 122 at ¶ 130).

The plaintiff commenced this action in February 2019, alleging that the defendant failed reasonably to investigate his disputed information under the FCRA.  *See* 15 U.S.C. § 1681s-2(b).  (Docket No. 1 at ¶ 54-62).  The Court has federal question jurisdiction over the plaintiff's claim.  *See* 28 U.S.C. § 1331.  The defendant moves for summary judgment, arguing that its investigation was accurate and reasonable, and that the plaintiff has not sustained damages due to the defendant's alleged conduct.  (Docket No. 102).

**Legal Standard**

5

Under Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." An issue is "genuine" when a reasonable factfinder could resolve it in favor of the nonmoving party. *Morris v. Gov't Dev. Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir. 1994). A fact is "material" when it may affect the outcome of the suit. *Id.* When ruling on a motion for summary judgment, "the court must view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Scanlon v. Dep't of Army*, 277 F.3d 598, 600 (1st Cir. 2002) (citation omitted).

## Discussion

### 1.  Liability under the FCRA

The FCRA requires "furnishers of information," such as the defendant, to provide accurate information to CRAs. *See* 15 U.S.C. § 1681s-2(a)(1). When an individual disputes the accuracy of furnished information with a CRA, as the plaintiff did here, and the CRA informs the furnisher of the dispute, as the CRAs did here, the FCRA requires the furnisher to investigate the disputed information. *See id.* § 1681s-2(b)(1). The furnisher must undertake an objectively reasonable investigation. *See Chiang v. Verizon New Eng. Inc.*, 595 F.3d 26, 37 (1st Cir. 2010). For individuals aggrieved by a furnisher's failure to conduct a reasonable investigation, the FCRA provides a private right of action. *See id.* at 36. To prevail in such an action, a plaintiff must demonstrate that the disputed information was incomplete or inaccurate, and that the defendant's investigation of the information was unreasonable. *See id.* at 38. The defendant contends that summary judgment is appropriate because the plaintiff can do neither. (Docket No. 103 at 11).

### a.  Incomplete or Inaccurate Information

6

"Courts have held that a credit report is not accurate under [the] FCRA if it provides information in such a manner as to create a materially misleading impression." *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 148 (4th Cir. 2008).  Incomplete information creates a materially misleading impression when it can be expected to "adversely affect credit decisions." *Sepulvado v. CSC Credit Servs., Inc.*, 158 F.3d 890, 895 (5th Cir. 1998); *see also Chiang*, 595 F.3d at 37.  The question whether technically accurate information is sufficiently misleading to have adverse effect is generally a question for the jury.  *See Seamans v. Temple Univ.*, 744 F.3d 853, 865 (3d Cir. 2014).  In *Saunders*, 526 F.3d at 150, the court held that where a consumer's failure to pay a disputed debt "does not reflect financial irresponsibility," a jury reasonably can conclude that a furnisher's omission of the disputed nature of the debt renders the information sufficiently misleading.

Here, on the summary judgment record, a reasonable jury can find that the furnished information was materially misleading.  The plaintiff submitted his December 2017 and January 2018 payments to the defendant on time, but because the plaintiff entered the wrong account number, the defendant chose not to apply the payments to the plaintiff's account.[3]  The plaintiff's omission of a single digit in a ten-digit account number has no bearing on the plaintiff's financial responsibility.  Indeed, it is undisputed that the plaintiff attempted to submit the payments on time.  Thus, the defendant's report that the plaintiff's payments were late, without explanation, could have been expected to have an adverse effect.  *See Llewellyn v. Allstate Home Loans, Inc.*, 711 F.3d 1173, 1186 (10th Cir. 2013).  Whether that omission, in this case, was in fact materially

---

[3] While the defendant argues that it was "prevented" from applying the payment to the plaintiff's account because the plaintiff supplied the incorrect account number, (Docket No. 103 at 12), a jury reasonably can infer that, based on the defendant's acceptance of the payments the prior three months, the defendant had the ability to accept these payments as well.

misleading is a question best left to the jury.  Accordingly, summary judgment is inappropriate on this ground.

### b.  Reasonable Investigation

The reasonableness of an investigation depends on the circumstances of the case.  *See Chiang*, 595 F.3d at 38.  "The pertinent question is . . . whether the furnisher's procedures were reasonable in light of what it learned about the nature of the dispute from the description in the CRA's notice of dispute."  *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1157 (9th Cir. 2009).  While the information provided by the CRA determines the nature of the dispute to be investigated, it does not cabin the scope of the investigation once undertaken.  *See id.* at 1157 n.11. A reasonable investigation "requires some degree of careful inquiry by furnishers of information." *Hinkle v. Midland Credit Management, Inc.*, 827 F.3d 1295, 1303 (11th Cir. 2016).

Here, the plaintiff provided relatively little information to the CRAs, stating only that the defendant's payment history was incorrect, that he had not been late on the account, and that the report should be updated to show "Never Late."  (Docket No. 122 at ¶ 111).  In turn, the CRAs notified the defendant that the plaintiff was contesting the accuracy of his account status, payment rating, and account history, and that he was "claim[ing] inaccurate information."  (Docket Nos. 111-8; 111-9).  The CRAs included a copy of the plaintiff's letter in their notices to the defendant. (Docket No. 122 at ¶ 113).  Because the letters clearly indicated that the plaintiff was disputing late payments, and the plaintiff had only two late payments to which the dispute could be referring, the reports were sufficient to notify the defendant of the nature of the dispute.  *Cf. Chiang*, 595 F.3d at 40 (limited investigation was reasonable where CRA reports largely consisted of broad, non-specific statements).  There is evidence in the record that the defendant's investigator reviewed the plaintiff's account, including the service notes detailing the plaintiff's many calls,

and verified the plaintiff's loan transaction and mortgage history.  (Docket Nos. 110 at ¶ 34; 122 at ¶ 117).  There also is evidence in the record that the defendant was unable to verify the timeliness of the plaintiff's payments based on the information the plaintiff provided.  (Docket No. 122 at ¶ 136).

The evidence, when viewed in the plaintiff's favor, however, suggests that the defendant's inquiry into the disputed information centered on the plaintiff's payment history.  (Docket No. 111-5 at 82).  Cenlar's corporate representative testified that the "one place to verify the payment dispute is with the payment history."  (Docket No. 111-5 at 82).  Information elsewhere in the plaintiff's account, meanwhile, readily indicated that the plaintiff had attempted to submit his payments on time -- in the same way he had done in the past -- but that the payments had been rejected by the defendant.  (Docket No. 111-14 at 6-8).  The fact that the defendant did not uncover and report to the CRAs the rather innocuous reason for the plaintiff's payments being rejected (an omission, which, as discussed *supra*, may have rendered the furnished information materially misleading) supports a finding that the investigation itself was unreasonable.  Accordingly, this question, too, is best left for the jury, and summary judgment is not warranted.  *See Westra v. Credit Control of Pinellas*, 409 F.3d 825, 827 (7th Cir. 2005) (summary judgment is appropriate when the reasonableness of the defendant's procedures is "beyond question"); *In re Software Toolworks Inc.*, 50 F.3d 615, 621 (9th Cir. 2004) (summary judgment is generally inappropriate for questions of reasonableness).

### 2. Damages

The FCRA permits recovery of actual and punitive damages; actual damages for negligent or willful violations, and punitive damages only for willful violations, *see* 15 U.S.C. §§ 1681n, 1681o.  The defendant contends that the plaintiff is entitled to neither, because the plaintiff has not

suffered harm attributable to the defendant's conduct, and because the plaintiff cannot prove that the defendant's alleged violation of the FCRA was willful.  (Docket No. 103 at 15, 21).

### a.  Actual Damages

The plaintiff alleges that he suffered financial and emotional harm.  He suffered financially, he argues, because he was unable to secure a loan to make necessary renovations to his house, and consequently, because he was required to pay rent to his son for six months and fund the renovations by other means.  (Docket No. 110 at ¶ 37).  He suffered emotionally, he contends, because of the anxiety and frustration that came with dealing with the defendant and having to move with his wife into his son's basement.  (Docket No 111-1 at ¶ 9).

The defendant doubts the plaintiff's economic damages because the plaintiff never formally applied for a loan, and therefore, the defendant maintains, the causal connection between the defendant's actions and the plaintiff's harm is speculative.  (Docket No. 103 at 16-19).  The defendant is correct that the plaintiff must demonstrate that the defendant's conduct was a cause of his harm.  *See Llewellyn*, 711 F.3d at 1181; *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1161 (11th Cir. 1991); *Barrepski v. Capital One Bank (U.S.A.) N.A.*, 2014 WL 935983, at *7 (D. Mass. Mar. 7, 2014).

The evidence, viewed in the plaintiff's favor, however, permits such an inference.  There is evidence in the record that the plaintiff was interested in obtaining a 100% home equity line of credit for renovations to his house, that his credit score dropped after the defendant reported the late payments, and that the plaintiff spoke to two lenders with whom he had previously dealt.  (Docket Nos. 111-7 at 112, 121, 130; 126-2 at 7-8).  Although the plaintiff never formally applied for a loan, one of the lenders submitted a declaration stating that he was contacted by the plaintiff in May 2018, and that he checked the plaintiff's credit report.  (Docket No. 111-19 at ¶ 3-4).  The

lender averred that, per underwriting guidelines, the plaintiff was ineligible for a conventional or FHA loan because he had two late mortgage payments reported in the most recent twelve-month period. (*Id.* at ¶ 5). The plaintiff's lowered credit score, moreover, rendered him ineligible for a conventional loan from Fannie Mae or Freddie Mac. (*Id.* at ¶ 6). Hence, while a conventional loan had an estimated interest rate of 4% and no upfront charges, the only loans available to the plaintiff were "sub-prime" loans with interest rates over 7% and various upfront charges. (*Id.* at ¶ 7). Unlike in *Llewellyn*, 711 F.3d at 1181, where the plaintiff put forth only hearsay statements to explain why a lender could not offer him a preferred loan, here, the lender himself averred to the circumstances under which loans can be approved. A jury reasonably can infer from this evidence that the plaintiff made efforts to obtain the 100% home equity loan but, because of the defendant's conduct, correctly concluded that he would be unable to get one.

Moreover, evidence of the plaintiff's rent checks to his son and the several thousand dollars in credit card charges to home improvement stores over a period of months, combined with testimony that the plaintiff's house lacked heating and septic systems when he bought it less than a year prior, support a conclusion that the plaintiff was financially harmed by his inability to obtain a loan. Thus, the plaintiff has presented sufficient evidence of economic damages at this stage. *See Austin v. Pawtucket Credit Union*, 2019 WL 3935185, at *5 (D. Mass. May 17, 2019) (plaintiff made sufficient showing at summary judgment based on evidence that defendant's repeated errors lowered plaintiff's credit score and caused her to pay a high interest on her mortgage).

The defendant dismisses the plaintiff's emotional damages as conclusory. (Docket No. 103 at 20). The plaintiff alleges that the defendant's actions took a "significant toll" on his life and wellbeing, and that he "suffered months of emotional distress, including constant anger, anxiety, annoyance and frustration with having to deal with [the defendant] and having to move

with [his] wife into [his] son's basement, all because of [the defendant's] refusal to listen to reason." (Docket No 111-1 at ¶ 9). "[C]ourts have consistently held that 'actual damages may include humiliation and mental distress, even in the absence of out-of-pocket expenses.'" *Richardson v. Fleet Bank of Mass.*, 190 F. Supp. 2d 81, 87 (D. Mass. 2001) (quoting *Casella v. Equifax Credit Info. Servs.*, 56 F.3d 469, 474 (2d Cir. 1995). The plaintiff's allegations, combined with the circumstances of this case, are more substantial than the allegations and circumstances in the cases cited by the defendant. *See, e.g.*, *Hernández-Rivera v. Crédito*, 2016 WL 5477576, at *4 n.11 (D. P.R. Sept. 29, 2016) (plaintiff "did not suffer any household or family problems"); *Allicon v. Verizon Wireless*, 2012 WL 380147, at *3 n.4 (D. N.H. Jan. 18, 2012) (plaintiff reported only "hours of consternation" in efforts to have records corrected). At this stage, viewing the evidence in the plaintiff's favor, there remains a genuine issue as to emotional damages. *See Richardson*, 190 F. Supp. 2d at 87; *Valvo v. Trans Union LLC*, 2005 WL 3618272, at * 6 (D. R.I. Oct. 27, 2005). Thus, summary judgment as to the plaintiff's actual damages is inappropriate.

### b.  Punitive Damages

A furnisher of information who willfully fails to comply with the FCRA is subject to punitive damages. *See* 15 U.S.C. § 1681n(a). "Actions showing a 'reckless indifference' to [a] plaintiff's rights under the FCRA can also constitute willfulness." *Veno v. AT&T Corp.*, 297 F. Supp. 2d 379, 384 (D. Mass. 2003); *see also Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007). A reckless disregard entails "an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Safeco*, 551 U.S. at 68 (quoting *Farmer v. Brennan*, 511 U.S. 825, 836 (1994)).

The defendant argues that the plaintiff cannot prove a willful or reckless violation because the defendant correctly reported the plaintiff's December 2017 and January 2018 payments as late.

(Docket No. 103 at 22).  Alternatively, the defendant contends that failure to correct an error after several notices does not alone constitute a willful or reckless violation.  (Docket Nos. 103 at 22; 121 at 8-9).  *See Barrepski*, 2014 WL 935983, at * 12 (defendant CRA's failure to correct an error in its credit reports after receiving several notices of the error did not establish a willful violation); *Valvo*, 2005 WL 3618272, at *8 (same); *Richardson*, 190 F. Supp. 2d at 89 (same).  The plaintiff counters that the defendant received more than several notices of error.  (Docket No. 109 at 25-26).  Indeed, after the plaintiff submitted disputes to the CRAs in the spring and summer of 2018, and even after the plaintiff filed the complaint in this action in February 2019, the defendant continued to report the plaintiff's December 2017 and January 2018 payments as late.  (Docket No. 122 at ¶ 133).  In April 2019, a CRA sent an ACDV to the defendant which noted, "Involved in litigation, Consumer states monthly loan payments deducted from bank account every month and has payment records reflecting that [the defendant] withdrew the January, February 2018 payments."  (Docket No. 122 at ¶ 132).  Yet the defendant's reporting "remained the same." (Docket No. 111-5 at 104).  This is enough to create a triable issue on punitive damages, given the Court's conclusion that, based on this record, a reasonable jury can find the defendant's reporting inaccurate and investigation unreasonable.

In *Austin*, 2019 WL 3935185, at *4, the court concluded that a jury could find that the defendant had acted recklessly in willful violation of the FCRA in part because, even after the suit had been filed, the defendant continued to report the information as accurate in response to a CRA's independent inquiry concerning the validity of the defendant's records.  Likewise, here, if a jury reasonably can conclude that furnished information is inaccurate, and that the defendant failed reasonably to investigate and uncover the inaccuracy, a jury reasonably can conclude that the defendant's continued reporting of the inaccuracy, in light of this lawsuit and additional,

specific inquiries from the CRAs, is in conscious or reckless disregard of the plaintiff's rights.  *See Marchisio v. Carrington Mortg. Servs., LLC*, 919 F.3d 1288, 1303 (11th Cir. 2019).  Accordingly, summary judgment should not enter here as well.

### Conclusion

For the reasons stated, the motion (Docket No. 102) is ***denied***.

**SO ORDERED**

/s/ *Timothy S. Hillman*
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**

14